**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**Jeannie V.,**

                       **Plaintiff,**

**v.**                                  **3:18-CV-00910**
                                         **(NAM)**

**NANCY A. BERRYHILL, Acting Commissioner**
**of Social Security,**

                       **Defendant.**
_____

**Appearances:**

_Counsel for Plaintiff_:

   Peter A. Gorton
   Lachman, Gorton Law Firm
   P.O. Box 89
   1500 East Main Street
   Endicott, New York 13761

_Counsel for Defendant_:

   David L. Brown
   Social Security Administration
   Office of Regional General Counsel Region II
   26 Federal Plaza - Room 3904
   New York, New York 10278

   Daniel Stice Tarabelli
   Social Security Administration
   Office of the General Counsel
   15 Sudbury Street - Suite 625
   Boston, Massachusetts 02203

**Hon. Norman A. Mordue, Senior United States District Court Judge**

## MEMORANDUM-DECISION AND ORDER

## I.  INTRODUCTION

Plaintiff Jeannie V. filed this action under 42 U.S.C. §§ 405(g), 1383(c)(3), challenging the denial of her applications for Social Security disability insurance benefits ("DIB") and supplemental security income ("SSI") under the Social Security Act ("the Act").  (Dkt. No. 1). The parties' briefs, filed in accordance with N.D.N.Y. General Order 18, are presently before the Court.  (Dkt. Nos. 11, 15, 18).  After carefully reviewing the administrative record, (Dkt. No. 8), and considering the parties' arguments, the Court reverses the Acting Commissioner's determination, and remands for further proceedings consistent with this opinion.

## II.  BACKGROUND

### A.  Procedural History

Plaintiff initially applied for disability benefits in November 2014, alleging that she had been disabled since October 1, 2009 due to depression, anxiety, knee pain, learning disability, and obesity.  (R. 68, 79, 201).  The Social Security Administration ("SSA") denied Plaintiff's claim on March 5, 2015.  (*See* R. 86–91).  Plaintiff appealed and requested a hearing before an Administrative Law Judge ("ALJ").  (R. 94–95).  That hearing was held on May 5, 2017 before ALJ Jeremy Eldred.  (R. 40–67).  Plaintiff testified and was represented by counsel at the hearing.  On August 22, 2017, the ALJ issued a decision finding that Plaintiff was not disabled. (R. 20–35).  Plaintiff's subsequent request for a review by the Appeals Council was denied.  (R. 1–6).  Plaintiff commenced this action on August 3, 2018.  (Dkt. No. 1).

### B.  Plaintiff's Background and Testimony

Plaintiff was born in 1982.  (R. 181).  She attended school until ninth grade.  (R. 202). Plaintiff had been enrolled in special education courses.  (*Id*.).  Plaintiff previously worked as a fast food worker (April 2005 through December 2007), and a cashier (November 2008 through

October 2009).  (R. 203).  Plaintiff testified that she stopped working "because [she] got pregnant with [her] daughter and [her] pregnancies are high risk."  (R. 47).  Plaintiff has not been employed since.  (R. 46).

Plaintiff testified that she suffers from "really high anxiety that makes it hard for [her] to be around a lot of people."  (R. 48).  She stated that she sleeps a lot because of her medication and her bipolar disorder.  (*Id*.).  She explained that her bipolar disorder causes her to suffer from swings between manic and depressed states.  (R. 48–49).  When she is manic, she sleeps less and feels like she "ha[s] to do something and be moving and on the go."  (*Id*.).  When she is depressed, she feels very unhappy, and sleeps a lot.  (R. 49).  Plaintiff explained that "[t]he medication helps some with the manic, but [she] still [suffers from] the depression and anxiety."  (*Id*.).  Plaintiff attends therapy on a bi-weekly basis.  (R. 49–50).  She also described trouble with her memory and dealing with more than one person at a time.  (R. 50).

With regard to her daily living, Plaintiff testified that: "I get my kids off to school, usually I go back to sleep and sleep until around noon and then I watch the TV with my grandmother or sleep some more and when my kids get home, I take care of my kids."  (R. 50).  Plaintiff explained that she lives with her husband, her two young children, and her grandmother.  (*See* R. 55–58).  Plaintiff stated that she assists her grandmother by organizing her medications and preparing her meals.  (R. 58).  She stated that she can cook meals on a daily basis, do laundry, and shop in stores and online.  (R. 51).  When asked whether her depression and anxiety kept her from cooking and cleaning, Plaintiff responded: "No, I force myself to do those things."  (R. 56).  She stated that she has no physical limitations that prevent her from sitting, standing, walking, or lifting.  (R. 51).  Plaintiff stated that she used to enjoy reading, but

now has trouble concentrating.  (*Id*.).  When asked about household finances, Plaintiff stated that "[her husband] pays, but [she] handle[s] the money to make sure they get paid."  (R. 55, 59).

In January 2015, Plaintiff reported that she cooked and cleaned every day, did laundry eight times a week, went shopping once a week, and shoveled in the winter.  (R. 364, 211).  She reported showering four times a week and dressing every day.  (*Id*.).  When she needs to travel, Plaintiff uses public transportation, walks, or gets a ride from her mother.  (R. 45).

### C.  Medical Evidence of Physical Disability

Plaintiff's claim for disability benefits stems from her continued challenges with depression, anxiety, and bipolar disorder.  Plaintiff has struggled with these conditions since childhood.  (R. 76, 370).

### 1.  Dr. Mahon, Treating Psychiatrist

Plaintiff started seeing Kanchan M. Mahon, M.D. in December 2014 after she had been recommended for psychiatric evaluation for bipolar disorder by her therapist.  (R. 422).  Plaintiff was observed to have suffered from symptoms of anhedonia, anergia, amotivation, isolation/withdrawal (no friends), anxiety, irritability, anger, inappropriate guilt and self-blame, hopelessness, worthlessness, suicidal ideation, history of attempted suicide, hyperverbal and pressured speech, paranoia, and mania.  (R. 423).  Plaintiff reported that she was sexually abused as a child.  (R. 424).  Dr. Mahon noted that Plaintiff struggled with intrusive recollections, worries that her kids are safe, anger, hypervigilance, exaggerated startle response, inability to recall, restricted affect, detachment or perceived estrangement, avoidance of thoughts, avoidance of activities, places or people that cause thoughts of trauma, no expectation of normal life, and inattention characterized by not following through, difficulty with organization, and being easily distracted.  (R. 424–25).

Dr. Mahon's records from 2015 through 2017 indicate that Plaintiff continued to struggle with a host of problems, including: poor motivation, poor energy, anxiety, depression, irritability, excessive worry, and panic attacks. (*See, e.g.*, R. 387, 388, 391–92, 395, 398, 400, 404–06, 408, 410, 412, 416–18). Dr. Mahon observed Plaintiff with a "flat affect," and noted Plaintiff's struggle with insomnia and poor concentration. (*See, e.g.*, R. 390–92, 395, 398, 404–06, 408, 410, 412, 416–18). Plaintiff reported feeling "easily overwhelmed" and "distracted." (R. 400).

In February 2017, Plaintiff reported increased anxiety and depression and ongoing irritability. (R. 384). She reported fatigue, low to no motivation, restlessness, and passive suicidal ideation. (*Id.*). Dr. Mahon's records from March 2017 note that Plaintiff is "doing very poorly still with anhedonia and passive [suicidal ideation], weight gain, fatigue." (R. 482). Dr. Mahon observed that Plaintiff had continuing anxiety, depression, mania, irritability, flat affect, poor concentration, and Attention Deficit Hyperactive Disorder ("ADHD"). (*Id.*).

Dr. Mahon completed a Medical Source Statement in March 2017 indicating that Plaintiff had marked limitations with her ability to: (1) maintain attention and concentration; and (2) perform activities within a schedule, maintain regular attendance and/or be punctual within customary tolerances. (R. 377). Dr. Mahon determined that Plaintiff would have no limitation interacting with the general public, but had medium limitations with accepting instructions, getting along with co-workers, and dealing with stress at work. (*Id.*). Dr. Mahon estimated that that Plaintiff's conditions would likely cause her to be absent from work at least 3 days per month, and would be "off task" for 33 percent or more of a normal work day. (R. 378). She described Plaintiff as "very irritable, easily angered, very anxious, and depressed." (*Id.*). Dr.

Mahon further assessed that Plaintiff had poor concentration and motivation, and often exhibited a flat affect, psychomotor retardation, and endorsed ongoing suicidal throughs. (*Id*.).

### 2. Hyman Rubin, Treating Therapist

Plaintiff was also seen by Hyman Rubin, a Licensed Clinical Social Worker Psychotherapist ("LCSW-R"), at United Health Services from March 2014 through June 2017. (*See generally* R. 312–13, 453–939). Rubin's treatment notes from that period document Plaintiff's continued struggle with low energy, poor motivation, anxiety, depression, irritability and excessive worry. (*See* R. 613, 678, 685, 687, 741, 744, 833, 836, 851, 861–62). Plaintiff described having panic attacks two or three times per week. (R. 741, 744). She reported that the "continuation of [her] initial symptoms" made her functioning "somewhat difficult." (R. 677). Plaintiff described her state of mind, asserting that: "I am feeling overwhelmed about everything, my whole life is a disaster." (R. 484). Rubin's treatment notes indicate Plaintiff's struggle with her son's serious behavioral problems. (*See, e.g.*, R. 494. 504, 529, 703). Rubin's notes indicate that Plaintiff had suicidal thoughts, but denied plan and intent. (*Id*.). Rubin frequently encouraged Plaintiff to stay active, to practice stress reduction techniques, and instructed her to "focus on what is positive in her life and avoid self-blame." (*See, e.g.*, R. 494, 497, 504, 529, 703, 731, 788, 794, 827).

Rubin's treatment notes indicate that Plaintiff showed little improvement throughout the course of treatment. (*See generally* R. 312–13, 453–939). The record also contains Rubin's undated Medical Assessment Form evaluating Plaintiff's mental health. (R. 933). That form indicates that Plaintiff had no limitations for: understanding and remembering instructions; correctly carrying out instructions; making appropriate simple decisions; maintaining socially appropriate behavior without crying, yelling, or walking out; and maintaining basic standards of

personal hygiene.  (*Id*.).  The form indicates that Plaintiff had moderate limitations for: making appropriate decisions in unfamiliar circumstances; and maintaining concentration and attention.  (R. 933).  Rubin determined that Plaintiff would have a "very limited" ability to function in a work setting at a consistent pace.  (*Id*.).  Rubin's assessment concludes that "[Plaintiff] would not be able to function effectively in a work environment due to depression."  (*Id*.).

### 3. United Health Services, Primary Care Provider

Plaintiff's medical records from various doctors at her primary care provider, United Health Services ("UHS"), indicate general medical issues related to Plaintiff's obesity, thyroid issues, depression, anxiety, bipolar disorder, and tiredness.  (*See generally* R. 319–61, 560–75, 633–47, 677–93, 721–30, 857–66, 904–12).

### 4. Dr. Kim, Tier Orthopedic Associates PC

In September 2014, Plaintiff described having knee pain for two years, causing her to have difficulty going up and down stairs.  (R. 316).  An MRI showed that Plaintiff had "a tear in the posterior part of her medial meniscus with capsular edema."  (*Id*.).  In October 2014, Dr. Kyung Kim, M.D. performed a minimally invasive arthroscopy on Plaintiff's right knee.  (R. 314–15).  Following the procedure, Dr. Kim noted that Plaintiff "tolerated this procedure very well."  (R. 315).

### D. Consultative Examiners

### 1. Dr. Long, Psychiatric Consultative Examiner

In July 2014, Plaintiff was seen by Sara Long, Ph.D. for a psychiatric consultative examination and intelligence evaluation.  (R. 302–09).  Dr. Long noted that Plaintiff was "cooperative with good social skills," and that Plaintiff maintained appropriate eye contact and did not indicate experiencing any stress or discomfort.  (R. 303).  Plaintiff appeared "neat and

well groomed," and presented with normal posture and motor behavior. (*Id*.). Plaintiff demonstrated reading proficiency at a 6.4 grade level. (*Id*.). Dr. Long noted that Plaintiff "is functioning on a borderline intellectual level," with her processing speed, verbal comprehension, perceptual reasoning, and working memory all in the low-average level. (*Id*.). Plaintiff reported to Dr. Long that she took care of her own grooming, cooked, cleaned, did laundry, and went shopping. (R. 304).

Dr. Long noted that Plaintiff's "[p]rognosis is good given vocational counseling and appropriate accommodations." (R. 304). Dr. Long's intellectual evaluation concluded that:

> No limitations were observed regarding following and understanding simple directions and performing simple tasks. [Plaintiff] was able to maintain attention and concentration and is able to maintain a regular schedule. She is able to learn new tasks, perform some complex tasks with possibly moderate, at times, marked limitations. She is able to make appropriate decisions, relate adequately with others, and is capable of adequate stress management.

(*Id*.). Dr. Long diagnosed Plaintiff with "adjustment disorder with anxiety," and "intellectual disabilities," including a reading disability. (*Id*.).

Dr. Long's mental status evaluation indicated that Plaintiff's "speech was fluent and clear with adequate receptive and expressive language." (R. 307). Dr. Long found that Plaintiff's thought processes were "coherent and goal directed," with "no indication of any sensory thought disorder." (*Id*.). Dr. Long observed that Plaintiff's orientation, attention, concentration, and memory were intact, but evaluated Plaintiff's insight and judgment as "poor to fair." (*Id*.). Dr. Long's psychiatric evaluation concluded that:

> No limitations were observed regarding following and understanding simple directions and performing simple tasks . . . . [Plaintiff] is able to make appropriate decisions, relate adequately with others, and is capable of adequate stress management.

8

> The results of the present evaluation appear to be consistent with
> psychiatric and cognitive problems which may, at times, interfere
> with her ability to function on a regular basis.

(R. 308).

## 2. Dr. Moore, Psychiatric Consultative Examiner

In January 2015, Plaintiff presented to Mary Ann Moore, Psy.D. for a psychiatric evaluation. (R. 369–73). Plaintiff reported that "[h]er moods depend upon what she does, but she will always do a little bit of cleaning because things have to be perfect or else she worries that something bad is going to happen to [her] children." (R. 372). Plaintiff stated that she did not have a driver's license because she was too scared to drive, and stated that she would not take the bus if it was crowded with a lot of people. (*Id*.). Plaintiff indicated that she has several friends that she is close to, and spends most of her time caring for her children. (*Id*.). Plaintiff stated that she has trouble getting along with her mother. (R. 372). Dr. Moore determined that:

> The claimant shows no limitation [with] regard to following and
> understanding simple directions and instructions and performing
> simple tasks independently. No limitation in regard to maintaining
> attention and concentration, learning new tasks, and performing
> complex tasks independently. Marked limitation in regard to
> appropriately dealing with stress, relating adequately with others,
> making appropriate decisions, and maintaining a regular schedule.
>
> The results of the examination appear to be consistent psychiatric
> issues, [which] may significantly interfere with claimant's ability to
> function on a daily basis.

(*Id*.). Dr. Moore diagnosed Plaintiff with generalized anxiety disorder, panic disorder with agoraphobia, bipolar II disorder without psychotic features, and post-traumatic stress disorder ("PTSD"). (R. 373). Dr. Moore assessed that Plaintiff's prognosis was "[g]uarded with hopes that with treatment it becomes more positive," and recommended that Plaintiff receive consistent psychological treatment. (*Id*.).

9

### 3. Dr. Jenouri, Physical Consultative Examiner

Plaintiff also presented to Gilbert Jenouri, M.D. in January 2015 for an internal medicine examination. (R. 364–67). Dr. Jenouri noted Plaintiff's history of anxiety, depression, bipolar, and obsessive-compulsive disorder ("OCD"). (R. 364). Plaintiff described having continued knee pain following her knee surgery in 2014. (*Id*.). Dr. Jenouri noted that Plaintiff demonstrated no acute distress, a normal gait and stance, could complete an 80 percent squat, and was able to rise from a chair without difficulty. (R. 365). Plaintiff had full range of motion in her shoulders, elbows, forearms, and wrists, and demonstrated full strength in her upper and lower extremities. (R. 366). Plaintiff's hand and grip strength were also intact. (*Id*.). Dr. Jenouri concluded that Plaintiff had "minimal to mild restriction walking, standing, sitting long periods, bending, stair climbing, lifting, and carrying." (*Id*.). Dr. Jenouri assessed that Plaintiff's prognosis was "stable," and diagnosed her with arthritis, bilateral knee pain, depression, anxiety, bipolar and OCD. (*Id*.).

### 4. Dr. Nobel, Non-Examining Medical Consultant

In January 2015, State agency medical consultant Richard Nobel, Ph.D. determined that claimant was not disabled and was capable of simple work. (*See* R. 69–78, 80–85). Dr. Nobel found that Plaintiff had limitations in sustained concentration and persistence, but did not have understanding or memory limitations. (R. 75). Based on his review of Plaintiff's medical record, Dr. Nobel determined that Plaintiff was: (1) moderately limited in her ability to work in coordination with others; (2) moderately limited in her ability to carry out detailed instructions; (3) not significantly limited from making simple work-related decisions; (4) not significantly

limited from sustaining an ordinary routine; and (5) moderately limited in her ability to complete a normal workday and workweek without medical interruption.  (R. 75–76).

### E.  ALJ's Decision Denying Benefits

On August 22, 2017, the ALJ issued a decision denying Plaintiff's applications for disability benefits.  (R. 20–35).  At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since October 1, 2009, the alleged onset date for her disability.  (R. 27).

At step two, the ALJ determined that, under 20 C.F.R. §§ 404.1520(c), 416.920(c), Plaintiff had seven "severe" impairments, including: bipolar disorder, OCD, PTSD, ADHD, intellectual disorder, arthritis of the right knee (status post arthroscopy), and obesity.  (R. 27).

At step three, the ALJ found that, while severe, Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926)."  (R. 28).  The ALJ found that Plaintiff only had moderate limitations in: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  (R. 28).  The ALJ noted that "[a]lthough the claimant testified that she feels like she does not want to do anything and has difficulty being around people, recent mental health treatment records indicate that the claimant feels motivated when she has things to do."  (*Id.*).  The ALJ reasoned that evidence showing Plaintiff's enjoyment of reported outings in public places "indicate[d] that the claimant maintains reasonable social functioning."  (*Id.*).  The ALJ also considered Plaintiff's testimony regarding her use of public transportation and her ability to cook, clean, perform childcare, manage money and pay bills as evidence that "claimant maintains a

11

reasonable ability to maintain attention [ ], adapt, and concentrate." (R. 29). The ALJ also

found that the evidence showed Plaintiff had more than a minimal capacity to adapt to changes

in her environment. (*Id*.). The ALJ noted that "there is nothing of record to suggest that the

claimant has required a highly structured setting to diminish the symptoms and signs of her

psychiatric condition during the period under consideration." (*Id*.).

At step four, the ALJ determined that Plaintiff:

> has the residual functional capacity to perform light work, as
> defined in 20 C.F.R. 404.1567(b) and 416.967(b), except she can
> perform only simple, routine tasks, can make only simple work-
> related decisions, and can do work that requires no more than
> occasional interaction with supervisors, co-workers, or the public.

(R. 29). In making that finding, the ALJ determined that "the evidence does not generally

support the claimant's alleged loss of functioning." (R. 30). Specifically, in reviewing the

record, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be

expected to produce her alleged symptoms; however, the claimant's statements concerning the

intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the

medical evidence and other evidence in the record." (*Id*.).

Regarding Plaintiff's symptoms, the ALJ considered Plaintiff's activities of daily living,

including Plaintiff's statements that she cooks and cleans every day, does laundry eight times a

week, and cares for her children. (R. 30). The ALJ considered the fact that Plaintiff "is able to

go out alone, and does so on an almost daily basis." (R. 30–31). The ALJ noted that Plaintiff is

able to regularly attend church, go shopping, manage household bills, socialize, and read to her

children. (R. 31, 212–13). In sum, the ALJ concluded that Plaintiff's "ability to engage in such

a wide variety of activities of daily living is inconsistent with disability." (*Id*.).

With regard to the medical evidence, the ALJ gave great weight to Dr. Jenouri. (R. 31). Specifically, the ALJ relied on Dr. Jenouri's assessment that Plaintiff had "a minimal to mild restriction for walking, standing, sitting long periods, bending, stair climbing, lifting, and carrying." (*Id*.). The ALJ also noted that: "[Plaintiff's] obesity was taken into consideration in determining her residual functional capacity. It is one of the reasons why I find her limited to light exertion." (*Id*.).

The ALJ also gave great weight to Dr. Long's opinion that "claimant has no limitations following and understanding simple directions and performing simple tasks . . . [and] claimant is able to maintain attention and concentration, as well as maintain a regular schedule." (R. 32). The ALJ also noted that Dr. Long assessed that: "[c]laimant is able to learn new tasks, and perform some complex tasks with possibly moderate, at times marked, limitations . . . [and] is able to make appropriate decisions, relate adequately with others, and is capable of adequate stress management." (*Id*.).

Similarly, the ALJ gave great weight to the State agency consultant, Dr. Nobel, who "determined that the claimant is capable of simple work." (R. 32). The ALJ noted that Dr. Nobel had reviewed Plaintiff's medical record and his ultimate opinion related directly to his professional specialty and program expertise. (*Id*.).

The ALJ gave partial weight to Dr. Moore's determination that "claimant has no limitation in following and understanding simple directions and instruction, performing simple tasks independently, maintaining attention and concentration, learning new tasks, and performing complex tasks independently, but has marked limitations in appropriately dealing with stress, relating adequately with others, making appropriate decisions, and maintaining a

regular schedule." (R. 32). The ALJ explained that "the marked functional limitations described by Dr. Moore are inconsistent with claimant's wide-ranging activities of daily living." (*Id.*).

The ALJ gave "little weight" to Dr. Mahon's Medical Source Statement, which concluded that Plaintiff had marked limitations to maintaining attention and concentration, and performing activities within a "regular schedule." (*See* R. 33, 377). The ALJ found that Dr. Mahon's conclusions were "inconsistent with both the significant medical evidence of record, and the claimant's activities of daily living." (R. 33). The ALJ also gave little weight to Hyman Rubin, Plaintiff's treating therapist, because "Mr. Rubin has lesser medical credentials than the other sources [ ] who have issued opinions indicating that the claimant has the mental capacity to perform substantial gainful activity." (R. 33).

The ALJ's step four analysis concludes that: "In sum, the [ ] residual functional capacity finding is supported by the opinions of Dr. Jenouri, Dr. Long, Dr. Nobel, and Dr. Moore, the objective medical evidence in the record, and the claimant's activities of daily living . . . ." (R. 33).

Finally, at step five, having evaluated Plaintiff's medical limitations, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (R. 34). Specifically, the ALJ cites the testimony of vocational expert Josiah Pearson, who testified at the hearing that an individual with Plaintiff's limitations would be able to perform the requirements of occupations such as a photocopy machine operator, a small products assembler, or a mail clerk. (*See* R. 34, 62–63). Pearson also testified that he believed Plaintiff could perform in jobs she had previously held as a fast food worker and as a cashier. (R. 62). On cross-examination by Plaintiff's counsel, Pearson testified that he was not aware of any jobs

that would be available to an employee that would be "off task" for 33 percent of the work day. (R. 65–66). Based on Pearson's testimony, the ALJ found that Plaintiff "was capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 34). Therefore, the ALJ concluded that Plaintiff was not disabled. (R. 35). The Appeals Council denied Plaintiff's request for further review. (R. 1–6).

## III. DISCUSSION

### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable

to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. §§ 404.1520, 416.920. The regulations define residual functional capacity ("RFC") as "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545, 416.945. In assessing the RFC of a claimant with multiple impairments, the Commissioner considers all "medically determinable impairments, including . . . medically determinable impairments that are not 'severe.'" *Id*. §§ 404.1545(a)(2), 416.945(a)(2). The claimant bears the initial burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

### B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151; *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112).

### C. Analysis

Plaintiff now argues that, in not finding her disabled, the ALJ erred in several respects, including: (1) failing to properly consider and give controlling weight to Dr. Mahon's medical opinion; (2) failing to properly evaluate whether Plaintiff could work consistently; (3) failing to properly weigh other medical sources in the record, including Drs. Long and Moore; and (4) reaching an ultimate disability determination that was not supported by substantial evidence. (*See generally* Dkt. No. 11).

Plaintiff first asserts that the ALJ improperly applied the treating physician rule by not giving controlling weight to Plaintiff's treating psychiatrist, Dr. Mahon. (Dkt. No. 11, pp. 9–18). Plaintiff notes that the ALJ's decision "mentions Dr. Mahon only once," and "does not acknowledge that Dr. Mahon is a treating physician and does not make mention of the treating physician rule." (*Id.*, p. 13). Plaintiff also contends that the ALJ's decision failed to give good reasons for assigning little weight to Dr. Mahon's opinion, and otherwise offering only a "conclusory statement" that Dr. Mahon's assessment was "inconsistent with both the significant medical evidence of record and the claimant's activities of daily living." (*Id.*). In response, the Government argues that the ALJ's decision to assign little weight to Dr. Mahon's opinion "must be viewed against the backdrop of an exhaustive five-page discussion of the treating records that preceded it." (Dkt. No. 15, p. 21). The Government asserts that "the ALJ provided an exhaustive overview of Plaintiff's daily activities," which "thoroughly refuted the limitation in Dr. Mahon's opinion." (*Id.*, p. 22). The Government argues that "Drs. Moore, Long, and Nobel did not assign Plaintiff any limitations that would prevent her from performing the jobs the ALJ

relied upon at step five," and that the ALJ's failure to refer to Dr. Mahon as a treating physician was not error because the ALJ "correctly analyzed the opinion by providing good reasons for rejecting it." (*Id.*, p. 23).

Under the treating physician rule, a hearing officer owes "deference to the medical opinion of a claimant's treating physician." *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). However, "[w]hen a treating physician's opinion is not consistent with other substantial evidence in the record, such as the opinions of other medical experts, . . . the hearing officer need not give the treating source opinion controlling weight." *Id.* Thus, "the Commissioner retains the discretion to reach a conclusion inconsistent with an opinion of a treating physician where that conclusion is supported by sufficient contradictory evidence." *Cohen v. Comm'r. of Soc. Sec.*, 643 F. App'x 51, 53 (2d Cir. 2016) (noting that an opinion from a claimant's treating physician is "not absolute").

Recently, in *Estrella v. Berryhill*, the Second Circuit reiterated its mandate that ALJs must follow specific procedures in determining the appropriate weight to assign a treating physician's opinion. *See generally* No. 17-3247, 2019 WL 2273574, at *2–5, 2019 U.S. App. LEXIS 15869, at *7–15 (2d Cir. May 29, 2019). The Circuit described the applicable standard, writing that:

> First, the ALJ must decide whether the opinion is entitled to controlling weight. "[T]he opinion of a claimant's treating physician as to the nature and severity of [an] impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Burgess*, 537 F.3d at 128 (third brackets in original) (quoting 20 C.F.R. § 404.1527(c)(2)). Second, if the ALJ decides the opinion is not entitled to controlling weight, it must determine how much weight, if any, to give it. In doing so, [the ALJ] must

"explicitly consider" the following, nonexclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013) (per curiam) (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). At both steps, the ALJ must "give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam) (quoting 20 C.F.R. § 404.1527(c)(2)).

*Estrella*, 2019 WL 2273574, at *2–3, 2019 U.S. App. LEXIS 15869, at *7–8. The Circuit also noted that "[a]n ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step two is a procedural error." *Id.* (citing *Selian*, 708 F.3d at 419–20). "If 'the Commissioner has not [otherwise] provided 'good reasons' [for its weight assignment],' we are unable to conclude that the error was harmless and consequently remand for the ALJ to 'comprehensively set forth [its] reasons.'" *Id.* (citing *Halloran*, 362 F.3d at 32–33).

Here, as Plaintiff points out, the ALJ's decision does not acknowledge that Dr. Mahon was Plaintiff's treating psychiatrist, nor does the ALJ summarize Dr. Mahon's treatment notes or Medical Source Statement. (*See* R. 33). Thus, the Court is unable to ascertain whether the ALJ reviewed and considered Dr. Mahon's treatment notes, or more importantly, whether the ALJ even applied the treating physician rule in the first instance. Indeed, the only reference to Dr. Mahon in the ALJ's decision is his conclusory statement that: "As for the assessment of Kanchan Mahon, M.D. [ ], I give his opinion little weight because these limitations are inconsistent with both the significant medical evidence of record, and the claimants activities of daily living." (R. 33). The ALJ provides no additional analysis explaining his decision to afford little weight to Dr. Mahon's findings that Plaintiff suffered from marked limitations in her ability to maintain attention and concentration, perform activities within a schedule, and maintain

19

regular attendance within customary tolerances.  (*See* R. 377).  The ALJ's cursory rejection of Dr. Mahon's opinion does not suffice under the treating physician rule.  *Selian*, 708 F.3d at 419 (remanding for further proceedings where "the ALJ made no effort to reconcile [ ] or grapple with [the treating physician's] diagnosis").

Although an ALJ is "not required to discuss every piece of evidence submitted," *Brault*, 683 F. 3d at 448, remand is appropriate where the ALJ's conclusions "do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." *Halloran*, 362 F.3d at 33.  In distinguishing "treating physicians" from other physicians, the Second Circuit has made clear that "ALJs should not rely heavily on the findings of consultative physicians after a single examination." *Selian*, 708 F.3d at 419; *see also Estrella*, 2019 WL 2273574, at *5, 2019 U.S. App. LEXIS 15869, at *13–14.  Yet here, in summarily rejecting Plaintiff's treating providers, the ALJ chose to credit the opinion of Dr. Nobel, who had never examined Plaintiff, and Drs. Long and Moore, who only examined Plaintiff once, over the opinions of Plaintiff's treating psychiatrist, Dr. Mahon, and her treating therapist, LCSW-R Rubin, who had both been treating Plaintiff for several years.  (*See* R. 32–33).

Notably, the medical record contains treatment notes from Plaintiff's appointments with Dr. Mahon from December 2014 through March 2017, many of which describe a severe and continued struggle with depression and other mental health issues.  (*See* R. 380–448).  Those records show that Plaintiff made little-to-no improvement despite continued efforts to treat her conditions with various medications and bi-weekly therapy.  (*See id*.).  In light of this considerable treatment record, the Court finds that the ALJ failed to provide a sufficient explanation for his decision to afford Dr. Mahon's opinion little weight.

Thus, because the ALJ's decision provides the Court with minimal assurance that the treating physician rule was applied in accordance with the standards set forth in *Estrella*, remand is necessary in this case. *See Bartrum v. Astrue*, 32 F. Supp. 3d 320, 331 (N.D.N.Y. 2012) ("This Court simply cannot, and will not, re-weigh the medical evidence and/or create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself."); *see also Morgan v. Colvin*, 592 F. App'x 49, 50 (2d Cir. 2015) (remanding where an ALJ's conclusory, one-sentence explanation for discrediting a treating physician did not fulfill his obligation to provide good reasons for the weight afforded); *Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 700 (2d Cir. 2013) (remanding where the ALJ gave only a conclusory explanation of why treating source's opinion was inconsistent with the record).

On remand, the ALJ should consider Dr. Mahon's treatment notes, Medical Source Statement, and deposition testimony in light of the treating physician rule. At a minimum, the ALJ should review the Second Circuit's decision in *Estrella*, and provide a more detailed analysis supporting his application of the treating physician rule.[1]

## IV. CONCLUSION

For the foregoing reasons it is

**ORDERED** that the decision of the Acting Commissioner is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for proceedings consistent with this Memorandum-Decision & Order; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case.

---

[1] Because remand is necessary in this case, the Court declines to address the additional arguments advanced by Plaintiff in support of the same relief. *See Insalaco v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 401, 410 (W.D.N.Y. 2018) (declining to reach a plaintiff's additional arguments after remanding for further administrative proceedings where the ALJ failed to properly apply the treating physician rule).

**IT IS SO ORDERED.**

Date:   June 17, 2019
　　　　Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge